Nashua District Court
No. 2000-551

N.A.P.P. REALTY TRUST

v.

CC ENTERPRISES A/K/A CC MULTI-MEDIA ENTERPRISES, INC. & a.

November 1, 2001

138

*Jordan, Maynard & Parodi, P.L.L.C.*, of Nashua (*Edward A. Jordan* on the brief and orally), for the plaintiff.

*Bolton Law Offices, P.A.*, of Nashua (*Steven A. Bolton* on the brief and orally), for the defendants.

DUGGAN, J. The defendants, CC Enterprises and its president, Christopher Currier, appeal from a Nashua District Court (*Howorth*, J.) order ruling that they violated the terms of their lease agreement by using the leased premises to sell and rent sexually explicit videos, magazines and related novelties. The plaintiff, N.A.P.P. Realty Trust, cross-appeals, asserting the trial court erred in denying its requests for relief on alternative grounds. We vacate and remand.

On February 20, 1999, the parties entered into an agreement to lease a unit within a shopping center in Hudson. According to the agreement, the unit was leased "for the purpose of operating a Video Multi-Media store and other related items." In April 1999, the defendants opened a business known as "Video Express of Hudson" (Video Express) on the premises. Video Express offers sexually explicit videos for sale and rent, as well as sexually explicit magazines and various sexual devices for sale. In the negotiations leading up to the agreement, the plaintiff did not expressly restrict the type of videos the defendants could rent and sell. The

defendants, however, did not explain that they intended to exclusively offer sexually explicit merchandise. Shortly after Video Express opened for business, the plaintiff served the defendants with notices to quit asserting, among other things, that the defendants' use of the premises violated article V of the lease agreement. Article V provides "that no trade or occupation shall be conducted in the Lease premises or use made thereof which will be unlawful, improper, noisy or offensive, or contrary to any law or any municipal by-law or ordinance in force in the Town of Hudson . . . ."

Following an eviction hearing, the district court refrained from ruling on the plaintiff's claim that the defendants' business is contrary to the law and ordinances of the Town of Hudson, noting that the issue would be resolved in a pending action brought against the defendants by the Town in superior court. The district court, however, did rule that based "on the subjective judgment . . . of third persons as well as the landlord's principal," the defendants' business was "offensive" within the meaning of the agreement and ordered a writ of possession to issue. This appeal and cross-appeal followed.

On appeal, the defendants argue the trial court erred when it applied a subjective standard to determine whether their use of the premises was "offensive" as the term was used in the agreement. They also contend the trial court improperly interpreted a general clause of the lease as prohibiting a use specifically allowed in another clause.

■ "A lease is a form of contract that is construed in accordance with the standard rules of contract interpretation." *Echo Consulting Services v. North Conway Bank*, 140 N.H. 566, 569 (1995). "[T]he proper interpretation of a lease is ultimately a question of law for this court to determine. A lease is interpreted to reflect the parties' intentions at the time of contracting." *Woodstock Soapstone Co. v. Carleton*, 133 N.H. 809, 815 (1991) (citation omitted). "[T]he language of a contract is ambiguous if the parties to the contract could reasonably disagree as to the meaning of that language." *Great Lakes Aircraft Co. v. City of Claremont*, 135 N.H. 270, 288 (1992) (quotation omitted). In this lease, the term "offensive" is reasonably subject to varying interpretations, and is therefore ambiguous. *Cf. Dalzell v. Harlow*, 129 N.H. 43, 44 (1986) (concluding phrase "use the . . . dock" ambiguous because phrase itself does not define scope of permissible uses).

In resolving the ambiguous terms of a contract, we apply different standards for different types of contracts. For example, the standard applied to interpreting much of the language of a promissory note is

provided by statute. *See, e.g., Mundaca Inv. Corp. v. Febba*, 143 N.H. 499, 501 (1999) (applying statutory standard to determine parties' obligations under promissory note). The standard applied to interpreting an insurance contract arises in part from the inequality in bargaining power. *See, e.g., Hudson v. Farm Family Mut. Ins. Co.*, 142 N.H. 144, 146 (1997) (construing ambiguous language to favor coverage for insured). In this case, the contract is for a commercial lease. Rules of statutory interpretation do not regulate this type of contract and the inequality in bargaining power that exists in insurance contracting does not exist here. Thus, the defendants argue that we should apply the objective standard generally used in contract interpretation. Under this standard, a court determines the parties' intent by assigning the meaning a reasonable person would give to an ambiguous term. *See Gamble v. University of New Hampshire*, 136 N.H. 9, 13-14 (1992).

· We recognize that "possible standards of [contract] interpretation fall into two categories: objective standards, which assign a meaning to words according to external criteria; and subjective standards, which assign meaning according to the state of mind of one or more parties to the agreement." 11 S. WILLISTON, CONTRACTS § 31:1, at 256 (4th ed. 1999). Objective standards include: the standard of reasonable expectation, which applies the meaning the party using an ambiguous term should reasonably have expected it would convey to the other party; and the standard of reasonable understanding, which applies the meaning that the person to whom the ambiguous term is addressed would reasonably suppose it to have. *See id.* at 256-57. Subjective standards include: the mutual standard, which applies only the meaning that conforms to an intention common to both or all the parties, and assigns this meaning even if it is contrary to the usage of all other persons; and the individual standard, which applies the meaning the person employing the term intended it to express, or the meaning the person receiving the communication understood the term to convey. *See id.* at 256.

■ Looking at the parties' subjective intentions alone accomplishes no more than restating their conflicting positions, and therefore cannot provide an appropriate standard for resolving the dispute in this case. Hence, the trial court erred to the extent it applied a subjective standard to interpret the term "offensive." The objective "expectation" and "understanding" standards are appropriate because they place a reasonable person in the position of the parties, and interpret the disputed term according to what a reasonable person would expect it to mean under the circumstances. In determining the parties' intentions under these standards, the court must give the disputed term the meaning "which the

party using the words should reasonably have apprehended that they would be understood by the other party, and the meaning which the recipient of the communication might reasonably have given to it." *Day v. A & G Construction Co., Inc.*, 528 P.2d 440, 445 (Alaska 1974) (quotation and citations omitted); *see Gamble*, 136 N.H. at 13; *see also* 11 S. WILLISTON, CONTRACTS § 31:9, at 343-44. In other words, the court must determine what the parties, as reasonable people, mutually understood the ambiguous term to mean.

■■ In applying this objective standard, the court should consider the parties' intent by examining the contract as a whole, the circumstances surrounding execution and the object intended by the agreement, keeping in mind our goal of giving effect to the intention of the parties. *See Woodstock Soapstone*, 133 N.H. at 815. This process necessarily involves factual findings. *See R. Zoppo Co. v. City of Dover*, 124 N.H. 666, 671 (1984). We will defer to the trial court's findings of fact, if supported by the evidence. *See Benzanson v. Hampshire Meadows Dev. Corp.*, 144 N.H. 298, 306-07 (1999). When we apply this standard to the record before us, however, we cannot determine what the landlord in this case should have reasonably expected and what the tenant should have reasonably understood the term "offensive" to mean in this lease. Accordingly, we remand to the district court for a hearing to determine whether upon applying this objective standard the defendants' use of the leased premises violates article V of the lease.

■ The plaintiff's cross-appeal challenges the district court's failure to rule that the plaintiff had "other good cause" to evict the defendants pursuant to RSA 540:2, II (e) (1997). RSA 540:2, II (e) provides that "[t]he lessor or owner of restricted property may terminate any tenancy [with proper notice, for specified reasons including] [o]ther good cause." Here, the plaintiff's property, however, is not "restricted property," which under the statute generally means residential. *See* RSA 540:1-a, II (1997). Thus, RSA 540:2, II (e) is inapplicable to the case before us.

Finally, the plaintiff argues that the district court erred in failing to rule on the plaintiff's requested rulings that the lease incorporated the Hudson zoning ordinances and that, regardless of the validity of the applicable zoning ordinance, violation of the ordinance constituted a breach of the lease. First, we fail to discern how this theory was presented in the plaintiff's requested rulings. Moreover, even if this theory was presented, the district court correctly declined to rule on it, noting an action resolving whether the defendants' business violates the Hudson zoning ordinances was then pending in the superior court. *Cf. In re N.H.P.U.C. Statewide*

*Elec. Util. Restructuring Plan,* 143 N.H. 233, 239 (1998) (declining to address on appeal issue pending in federal court).

*Vacated and remanded.*

BROCK, C.J., and BRODERICK, NADEAU and DALIANIS, JJ., concurred.