Rockingham
No. 2007-537

FOUNDATION FOR SEACOAST HEALTH

v.

HCA HEALTH SERVICES OF NEW HAMPSHIRE, INC. & a.

Argued: May 22, 2008
Opinion Issued: July 15, 2008

*Devine, Millimet & Branch P.A.*, of Manchester (*George R. Moore* and *Daniel E. Will* on the brief, and *Mr. Moore* orally), and *McDermott, Will & Emery LLP*, of Boston, Massachusetts (*Emily E. Smith-Lee* on the brief), for the plaintiff.

*McLane, Graf, Raulerson & Middleton P.A.*, of Manchester (*Wilbur A. Glahn, III* on the brief), and *Latham & Watkins LLP*, of Washington, D.C. (*Everett C. Johnson, Jr. & a.* on the brief, and *Mr. Johnson* orally), for the defendants.

HICKS, J. The plaintiff, Foundation for Seacoast Health (Foundation), appeals decisions of the Superior Court (*McHugh*, J.) granting the defendants', Hospital Corporation of America (HCA) and its successors and HCA Health Services of New Hampshire, Inc. (HCA-NH), motion for summary judgment and motion to dismiss, and denying the Foundation's motion for partial summary judgment. We affirm in part, vacate in part and remand.

*I. Background*

The trial court found or the record supports the following. In 1895, the New Hampshire legislature created the Portsmouth Regional Hospital (hospital) as a public trust. In 1983, the trustees of the hospital decided to sell the hospital and entered into an Asset Purchase Agreement (APA) with HCA and HCA-NH. When the parties entered into the APA, HCA was a publicly traded national corporation that owned all of the common stock of HCA-NH. Upon closing, HCA-NH became the owner of the hospital's assets and operator of the hospital.

The proceeds of the sale went to the creation of the Foundation, a nonprofit entity charged with, among other things, ensuring that the hospital continued to meet the healthcare needs of the community. The APA affords the Foundation a right of first refusal (ROFR) to repurchase the hospital's tangible assets under certain circumstances.

We note here that HCA has undergone numerous transactions since 1983 and is currently survived by a successor. For ease of reference, we adopt the defendants' use of the term "HCA3" to refer to the 1983 iteration of HCA and all its successors. We also note that the defendants acknowledge that HCA3 took HCA's place under the APA.

The ROFR provision reads as follows:

5.2.11. *Right to Repurchase Hospital.*

(a) *Right of First Refusal.* Neither [HCA3] nor HCA-NH will directly or indirectly by merger or transfer of stock or otherwise sell, transfer, assign, or otherwise dispose of all or any substantial part of the assets of the Hospital (a "Transfer") unless (i) [HCA3] shall have received a bona fide arm's length written offer with respect to the Transfer of such assets of the Hospital (a "Bona Fide Offer"), and (ii) prior to the making of any such Transfer, [HCA3] shall have given written notice to the Foundation stating its desire to dispose of such assets and enclosing a copy of the Bona Fide Offer. Thereafter, the Foundation shall have an assignable option to purchase all (but not less than all) of the tangible assets specified in such notice, said option to be exercised by the giving, by the Foundation or its assignee (the "Purchaser"), as appropriate, within 120 days after delivery of such notice, of a counter-notice stating that the sender of such counter-notice desires to purchase all of such assets. . . . Notwithstanding the foregoing, this Section 5.2.11(a) shall not apply to a Transfer by [HCA3] or HCA-NH to a wholly-owned subsidiary of [HCA3] ("Transferee") if, from and after such Transfer, the Transferee

shall perform and assume all obligations of [HCA3] and HCA-NH under this Agreement and prior to such Transfer shall agree to such performance and assumption of obligations in a writing satisfactory to the Seller; provided, however, that no such Transfer shall relieve [HCA3] from any of its obligations hereunder.

*APA* § 5.2.11(a).

HCA-NH continued to own and operate the hospital since the parties entered into the APA in 1983. However, numerous transactions and corporate restructurings occurred after 1983 significantly altering the corporate structure above HCA-NH. We need not recite every transaction here. Because the issues on appeal center around a 2006 leveraged buy-out (2006 LBO) and a transaction in 1999 (1999 transaction), we recite only those facts pertinent to these transactions.

By 1999, HCA3, now a limited liability company by merger, was held by a company called Healthtrust, Inc.—The Hospital Company (Healthtrust), which in turn was held by a company called Columbia/HCA Healthcare Corporation (Columbia). HCA3, in turn, owned 100% membership interest in Hospital Corp., LLC. Hospital Corp., LLC had previously been inserted, through a series of transactions, into the corporate chain between HCA3 and HCA-NH, and in 1999, it owned 100% of the common stock of HCA-NH, which continued to own the hospital's assets.

In the 1999 transaction, HCA3 transferred 100% of its membership interest in Hospital Corp., LLC to HCA3's parent, Healthtrust. This resulted in the removal of HCA3 from the hospital's corporate chain. HCA3 did not send the Foundation written notice of this transaction. After the 1999 transaction, Columbia was the parent corporation to Healthtrust, which held Hospital Corp., LLC, which was the parent company to HCA-NH, which owned the hospital's assets.

Over the next two years, Columbia's name was changed twice and by 2001, it was known as HCA Inc. In 2006, HCA Inc. was the subject of the 2006 LBO, through which a group of private investors acquired all of HCA Inc.'s stock. HCA Inc. did not send the Foundation written notice of this transaction. In response to inquiries from the Foundation, HCA Inc. sent a letter explaining its position that the ROFR was not triggered by the 2006 LBO.

In October 2006, before the 2006 LBO transaction was finalized, the Foundation filed suit against HCA3 and HCA-NH seeking: (1) a declaratory judgment that the proposed 2006 LBO triggered the ROFR; (2) injunctive relief to prohibit the LBO; (3) specific performance under the terms of the ROFR; and (4) damages for a breach of the implied covenant

of good faith and fair dealing. The Foundation subsequently withdrew its motion for injunctive relief and the HCA Inc. shareholders completed the 2006 LBO.

In March 2007, both the Foundation and the defendants filed motions for summary judgment. The defendants sought summary judgment on all counts; the Foundation sought partial summary judgment on its petition for declaratory judgment "that the recent sale of the Defendants' corporate parent triggered an unambiguous contractual right of first refusal belonging to the Foundation."

In April, before the hearing on the summary judgment motions, the Foundation filed an amended petition adding a claim for breach of contract for the refusal to give the Foundation "an opportunity to exercise its right of first refusal" during the 2006 LBO. The amended petition also added claims for breach of contract and breach of the implied covenant of good faith and fair dealing against the defendants for the 1999 transaction, which the Foundation asserted it had learned of "only recently."

In May 2007, the trial court issued an order denying the Foundation's motion for partial summary judgment and granting the defendants' motion for summary judgment, resulting in the dismissal of the Foundation's challenge to the 2006 LBO. Finding the language of the ROFR unambiguous, the trial court ruled:

> [A]bsent a "change of control" provision in a ROFR clause, a stock sale does not generally amount to a transfer of corporate assets that will trigger the ROFR. . . .
>
> [T]he plain terms of the ROFR at issue here do not guarantee the Foundation a right-of-first-refusal triggered by a change in HCA [Inc.]'s shareholders. HCA-NH is still the direct owner of the assets of Portsmouth Regional Hospital; until such time as those assets have been legally transferred to another entity, the ROFR lies dormant.

The defendants subsequently filed a motion to dismiss the Foundation's remaining claims regarding the 1999 transaction for failure to state a claim for which relief can be granted. The defendants argued that the court's summary judgment order compelled dismissal of the Foundation's remaining claims. The court agreed, ruling: "[The] prior order [of] the court found as a matter of law that the Foundation's ROFR is only triggered by an actual transfer of the assets[,]" and "[d]espite the corporate reformations . . . in 1999, actual ownership of the assets of the Hospital has remained constant." The Foundation argues that the trial court erred in finding "that only a transfer of the Hospital assets from their immediate owner triggers the right of first refusal."

*II. The Right of First Refusal Provision*

"The interpretation of a contract, including whether a contract term is ambiguous, is ultimately a question of law for this court to decide. Accordingly, we review a trial court's interpretation of a contract *de novo*." *Behrens v. S.P. Constr. Co.*, 153 N.H. 498, 500 (2006) (citation omitted).

When interpreting a contract, "our inquiry focuses on the intent of the contracting parties at the time of the agreement." *R. Zoppo Co. v. City of Dover*, 124 N.H. 666, 671 (1984).

> In the absence of ambiguity, the parties' intent will be determined from the plain meaning of the language used. The words and phrases used by the parties will be assigned their common meaning, and we will ascertain the intended purpose of the contract based upon the meaning that would be given to it by a reasonable person.

*Greenhalgh v. Presstek*, 152 N.H. 695, 698 (2005) (citation omitted).

The Foundation argues that the trial court erred in denying its motion for partial summary judgment because: (1) the plain language of the ROFR provision demonstrates an intent to reach parent-level stock transactions; (2) the ROFR provision and the APA as a whole demonstrate an intent to bind the entire corporate structure; (3) reading the APA as a whole reflects the broad reach of the ROFR provision intended by the parties; and (4) the inclusion of "change of control" language in the ROFR provision is not required for the ROFR to apply to a change in ownership of a parent company's stock.

The Foundation first argues that under the plain language of the ROFR provision, stock transactions involving parents or other upstream entities of HCA3 may trigger the ROFR. We disagree. The ROFR provision states: "Neither [HCA3] nor HCA-NH will . . . ." We find this phrase to be unambiguous. It specifies only two actors that can trigger the ROFR: HCA3 and HCA-NH. This language does not demonstrate an intent that actions, such as a stock transfer, by a parent or other upstream entity of HCA3 trigger the ROFR.

The Foundation, however, cites *H-B-S Partnership v. Aircoa Hospitality*, 114 P.3d 306 (N.M. Ct. App.), *cert. denied*, 113 P.3d 345 (N.M. 2005), *In re Asian Yard Partners*, Nos. 95-333-PJW, 95-334-PJW, 1995 WL 1781675 (Bankr. D. Del. Sept. 18, 1995) and *Continental Cablevision v. United Broadcasting*, 873 F.2d 717 (4th Cir. 1989), and argues that these courts have "conclude[d] that parent-level stock transactions trigger similar rights of first refusal" where the language "directly or indirectly" was included in the right of first refusal.

In *H-B-S Partnership*, the El Dorado Partnership (EDP) was formed by Aircoa Hospitality Services, Inc. (AHS), NZ EDP, Ltd. Company (NZ) and H-B-S Partnership (HBS), for the purpose of acquiring an interest in the El Dorado Hotel. *H-B-S Partnership*, 114 P.3d at 308. The partnership agreement contained the following right of first refusal (HBS ROFR):

> [I]f at any time a Partner proposes to sell, assign, or otherwise dispose of all or any part of his interest in the Partnership, such Partner ("Offeror") shall first make a written offer to sell such Partnership interest to the other Partners on the same terms and conditions on which the Offeror proposes to transfer the Partnership interest. Such offer shall state the name of the proposed transferee and all the terms and conditions of the proposed transfer, including the price to the proposed transferee . . . .
>
> . . . .
>
> For purposes of this agreement, restrictions upon the sale, assignment or disposition of a Partner's interest shall extend to any direct or indirect transfer including, without limitation: (a) an involuntary transfer such as a transfer pursuant to a foreclosure sale; (b) a transfer resulting by operation of law, or as a result of any merger, consolidation or similar action; and (c) the transfer of an equity interest in a Partner which is a corporation, partnership or other entity if the transfer of the equity interest results in a change in control of such corporation, partnership or other entity.

*Id.* at 308-09 (quotation omitted).

Subsequently, notice of a proposed sale of Richfield Holding Corporation (RHC), the great-great-grandparent of AHS (one of the partners) was sent to HBS and NZ. *Id.* at 310. Under the terms of the proposed sale, the seller offered a one hundred percent equity interest in RHC, which included all of RHC's interests in assets. *Id.* Among the assets listed was AHS's equity interest in EDP. *Id.* HBS sought to enforce the HBS ROFR against AHS and demanded that it be provided with an identical written offer. *Id.* AHS refused, denying that the HBS ROFR was triggered. *Id.* The sale of RHC went through and HBS brought suit against AHS. *Id.* at 310-11.

The court held that the sale of RHC "constitute[d] an indirect transfer of an 'equity interest in a Partner.'" *Id.* at 314 (emphasis omitted). The court emphasized that "'Transfer' is itself broadly defined by [the HBS ROFR provision] to encompass 'any direct or indirect transfer' of an equity interest by or in a partner 'without limitation[ ]'" and that, therefore, "the [HBS] ROFR is triggered regardless of whether the transaction is two or even five tiers removed, so long as it results in a change of that control of

AHS." *Id.* Recognizing "the general rule that a sale of a subsidiary by a parent corporation is not a sale of the subsidiary's assets, unless the assets are actually transferred," *id.,* the court held that the HBS ROFR provision was worded broadly so as to include such indirect transfers and that while "[t]he general rule will hold true in most cases, . . . [it] can be trumped by contract language," *id.* at 315.

While we recognize that *H-B-S Partnership* stands for the principle that a right of first refusal can be triggered by stock transactions of entities far up the corporate chain from the parties to the right of first refusal, it stands equally for the principle that the plain language of the right of first refusal controls over general principles of law. *Id.* at 314-15; *see also Glick v. Chocorua Forestlands, L.P.,* 157 N.H. 240, 247-48 (2008). As recognized by the *H-B-S Partnership* court, the HBS ROFR provision was worded broadly, as evidenced by the language: "without limitation" and "including . . . the transfer of an equity interest in a Partner . . . if [such] transfer . . . results in a change in control." *H-B-S Partnership,* 114 P.3d at 309 (quotations omitted).

The ROFR provision before us, however, is narrower than the one in *H-B-S Partnership.* While both ROFR provisions contain the term "indirectly," the ROFR provision before us does not contain language such as "without limitation" and "result[ing] in a change in control,"—language that the *H-B-S Partnership* court relied upon in its interpretation. *Id.* at 313. Accordingly, we find *H-B-S Partnership* distinguishable on this point.

In addition, we find that *Asian Yard* and *Continental* do not support the Foundation's argument that the language "directly or indirectly" binds corporate entities that are not parties to a right of first refusal. These cases, while involving a right of first refusal provision and an anti-assignment clause that contained "directly or indirectly" language, also involved transfers *by a party to the agreement. Asian Yard,* 1995 WL 1781675, at *5; *Continental,* 873 F.2d at 719. The courts in these cases, therefore, never addressed whether the term "indirectly" bound other entities that were not parties to the agreements.

■ Accordingly, we find the cases relied upon by the Foundation on this point to be unpersuasive. We rely instead upon the plain and unambiguous language of the ROFR provision, which unequivocally specifies the two actors that may trigger it, HCA3 or HCA-NH. If neither party acts, the ROFR is not triggered.

The Foundation next argues that the parties to the ROFR provision intended that it bind the entire corporate structure. The Foundation claims: (1) "the parties agreed to the terms 'directly or indirectly' and 'by merger or transfer of stock or otherwise,' language which has previously

been held to evidence an intent to bind the entire corporate structure"; (2) the APA contains language "applicable to all of the post-closing covenants, that clearly places the obligation to comply with those commitments on any member of the . . . corporate family in a position to effect compliance or noncompliance"; and (3) "the parties included language that restricted [HCA3] from transferring direct or indirect ownership of the Hospital assets within its corporate structure in a way that might defeat or impair the intended operation of the ROFR." We address each argument in turn.

The Foundation's first argument on this point is merely a reiteration of its previous argument, as noted in its brief. Therefore, we rely upon our analysis above regarding the "directly or indirectly" language.

The Foundation next argues that language found elsewhere in the APA establishes that actions by any member of the corporate family may trigger the ROFR. Specifically, the Foundation cites the following provision:

> 5.2. *Covenants Surviving the Closing*. In addition to their other undertakings herein, each of [HCA3] and HCA-NH hereby covenants and agrees that it will comply (and, to the extent applicable, will cause . . . [the] subsidiaries of [HCA3] to comply) from and after the date hereof with the provisions set forth in this Section 5.2.

We fail to see how this language establishes that actions by any member of the corporate family may trigger the ROFR. Its primary function is to bind HCA3 and HCA-NH to the terms set forth in Section 5.2. The Foundation, however, emphasizes the parenthetical language: "will cause . . . [the] subsidiaries of [HCA3] to comply." We read this unambiguous language of this provision to promise, and only "to the extent applicable," that HCA3 and HCA-NH "will cause . . . [the] *subsidiaries of [HCA3]* to comply[] . . . with the provisions set forth in Section 5.2." (Emphasis added). This provision, therefore, only addresses subsidiaries of HCA3. It does not evince an intent to include each member of the corporate family as an actor capable of triggering the ROFR contained in Section 5.2.11(a).

Finally on this issue, the Foundation argues that the ROFR provision contains language which prevents the defendants from engaging in intracorporate transactions that would defeat the "intended operation of the ROFR." The Foundation specifically points to a clause in the ROFR which allows "a Transfer by [HCA3] or HCA-NH to a wholly-owned subsidiary of [HCA3]" provided the subsidiary agrees in writing to the terms of the APA. *APA* § 5.2.11(a). This provision, however, specifically addresses only wholly-owned subsidiaries of HCA3.

Next, the Foundation argues that the APA, when read as a whole, reflects the parties' intent that the ROFR can be triggered by other actors in the hospital's corporate chain other than HCA3 and HCA-NH. It argues that "this Court has emphasized that rights of first refusal must be construed in the context of the entire agreement between the parties, and in view of both the situation of the parties at the time of contracting and the objects to be served by the contract provisions."

The Foundation argues that HCA3 was carefully selected due to the trustees' "concern about selling the Hospital to a for-profit entity and [that the trustees] negotiated an agreement designed to provide maximum protection to the community." This does not, however, change our reading of the unambiguous terms of the ROFR provision, which specify the constrained actors, HCA3 and HCA-NH. We do not agree with the Foundation's assessment that our interpretation fails to reflect the parties' intent, given the express terms of the ROFR provision.

Finally, on this point, the Foundation argues that inclusion of "change of control" language is not "required for [the] ROFR to apply to a change in ownership of a parent company's stock." This argument, however, misses the point. Even assuming, arguendo, that this is correct, it does not change the fact that the ROFR provision at issue is not triggered by transfers of stock by an upstream entity of HCA3. As we stated above, if neither HCA3 nor HCA-NH is the entity making the transfer, the ROFR is not triggered.

Accordingly, we hold that, under the plain language of the ROFR provision, only the actions of HCA3 or HCA-NH can trigger the ROFR.

### III. The 2006 Leveraged Buyout

The trial court found that the 2006 LBO did not trigger the ROFR because "a transfer of the hospital's assets simply did not occur—either directly or indirectly—during the . . . LBO in 2006. HCA-NH owns the assets of Portsmouth Regional Hospital today, just as it has since 1983." Because we conclude that neither HCA3 nor HCA-NH acted, however, we need not decide whether the trial court properly found that the hospital's assets were not transferred, either directly or indirectly, during the 2006 LBO. *See EnergyNorth Natural Gas v. Continental Ins. Co.*, 146 N.H. 156, 165 (2001) ("We will not overrule the trial court's grant of summary judgment where it reached the right result, albeit on mistaken grounds." (quotation omitted)).

■ In the 2006 LBO, the public shareholders of HCA Inc. approved a leveraged buy-out whereby all public shares in HCA Inc. were sold to private investors. HCA Inc. is the corporate great-grandparent of HCA-NH and an entirely distinct entity from HCA3. *See Maryville Hotel*

*Assocs. I, LLC v. IHC/Maryville Hotel Corp.*, No. 4:05 CV 1493 DDN, 2006 WL 1237264, at *5 (E.D. Mo. May 5, 2006) (refusing to find "that the corporate defendant . . . acted to sell[] or transfer[] property interests because its corporate grandparent did so"). Moreover, HCA Inc. itself did not act; it was HCA Inc.'s shareholders who acted in the leveraged buy-out. These facts are not disputed. Thus, neither HCA3 nor HCA-NH acted in the 2006 LBO, and, as explained above, the ROFR was not triggered. *See White Wave, Inc. v. Dean Foods Company*, No. CIV.A. 01-M-1073, 2001 WL 1833980 (D.Colo. Dec. 5, 2001); *Maryville Hotel*, 2006 WL 1237264, at *5-*6.

Accordingly, the defendants are entitled to summary judgment on all counts involving the 2006 LBO and the Foundation's motion for partial summary judgment was properly denied.

*IV. The 1999 Transaction*

Next, we address the trial court's order dismissing the Foundation's remaining counts for breach of contract and breach of the covenant of good faith and fair dealing regarding the 1999 transaction.

> The standard this court applies in reviewing a motion to dismiss is whether or not the plaintiff's allegations are reasonably susceptible of a construction that would permit recovery. We take as true all facts well pleaded, and construe all reasonable inferences therefrom in the light most favorable to the nonmoving party.

*Bio Energy v. Town of Hopkinton*, 153 N.H. 145, 151 (2005) (citation, quotations and brackets omitted).

First, we note that the Foundation's petition alleges that "[HCA3], the successor in interest to the original purchaser of the Hospital," made a transfer. Therefore, the first requirement under the ROFR provision is met, since HCA3 acted. The question before us, therefore, is whether the Foundation's petition sufficiently alleges that a "Transfer" occurred either "directly or indirectly by merger or transfer of stock or otherwise" that disposed of the assets of the hospital. *APA* § 5.2.11(a).

In support of its claims for breach of contract and breach of the covenant of good faith and fair dealing, the Foundation alleges:

> [The following] transaction[ ] involved a direct breach of the Foundation's right of first refusal. . . . [I]n 1999, [HCA3], the successor in interest to the original purchaser of the Hospital, conveyed or otherwise transferred both HCA-NH and the Hospital to its own corporate parent [Healthtrust], without providing notice to the Foundation.

. . . .

35. Healthtrust was the corporate parent of [HCA3], and was not a wholly owned subsidiary of [HCA3].

. . . .

37. At no time did the Defendants notify the Foundation of the 1999 Transaction nor did they give the Foundation an opportunity to purchase the Hospital pursuant to Section 5.2.11(a).

. . . .

70. As set forth above, the actions of the Defendants constitute a breach of the Foundation's rights under Section 5.2.11(a) of the Agreement . . . .

71. As a result of Defendant[s'] actions, the Foundation was denied the opportunity to purchase the Hospital's assets and/or pursue its available remedies under the APA. Defendants' breach has caused and continues to cause the Foundation to suffer damages.

. . . .

88. Defendants, without justification and in bad faith, have interfered with the Foundation's ability to exercise its rights under the Agreement by concealing and failing to provide notice of numerous transactions within the HCA corporate family between 1983 and the present, including the 1999 Transaction, and by conducting their affairs with the Foundation in a manner which indicated that these changes had not occurred.

Accordingly, the Foundation alleged that in 1999, HCA3 "transferred both HCA-NH and the Hospital to its own corporate parent," that no notice was given and that this transfer constituted a breach of its ROFR. The Foundation argues that these allegations are reasonably susceptible of a construction that would permit recovery under the ROFR provision which provides that the ROFR is triggered when either HCA3 or HCA-NH disposes of the hospital's assets "indirectly by merger or transfer of stock or otherwise." The defendants argue that this provision does not apply to the 1999 transaction.

The trial court did not reach this issue because it granted the motion to dismiss based upon its finding that "actual ownership of the assets of the Hospital has remained constant. . . . [T]he Foundation's ROFR is only triggered by an actual transfer of the assets of the Hospital [and] . . . the Foundation has failed to allege facts showing an actual asset transfer."

The Foundation argues that the trial court did not address the actual dispute between the parties, but instead "adopted its own, narrower construction of the APA." It asserts:

> Prior to the Superior Court's Order on summary judgment, neither party had ever taken the position that only a conveyance of the Hospital assets could trigger the right of first refusal. Instead, the parties agreed that some stock transactions triggered the right, but disputed how far up the corporate chain the provision was intended to reach.

Indeed, the defendants acknowledged in the trial court and on appeal that the language "indirectly by merger or transfer of stock or otherwise" has meaning and assert that a transfer of HCA-NH's stock or a merger of HCA-NH would trigger the ROFR. They argue, however, that this language was *only* meant to reach transactions at HCA-NH's level, and not meant to reach parents or other upstream entities of HCA-NH, such as when, in the 1999 transaction, HCA-NH's *parent* (*i.e.*, Hospital Corp., LLC) was transferred by HCA3 to HCA3's parent (*i.e.*, Healthtrust).

We agree with the parties that the phrase "indirectly by merger or transfer of stock or otherwise" demonstrates the contracting parties' intent to reach transactions in addition to a direct conveyance of the hospital's assets.

■ The trial court correctly ruled that, generally, a right of first refusal restricting the transfer of a company's assets is not triggered by transactions such as the company's parent undergoing a merger, or all of the parent's stock being transferred to another entity. "A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003); *see also* 19 C.J.S. *Corporations* § 909, at 423 (2007) ("A merger does not affect the status of the assets of a subsidiary of one of the parties to the merger, if the subsidiary's own corporate existence was not affected.").

■ However, where the language of the right of first refusal expressly provides that a merger or transfer of stock may constitute an indirect transfer of assets, we adhere to the express terms of the contract language. *Cf. Glick*, 157 N.H. at 247 (focusing upon the "intent of the parties, as manifested in the language of the entire contract" to determine scope of ROFR, rather than broad principles of law (emphasis omitted)); *see also* *H-B-S Partnership*, 114 P.3d at 315 ("The general rule will hold true in most cases, but can be trumped by contract language."). Here, the language

of the ROFR provision provides, in relevant part: "Neither [HCA3] nor HCA-NH will directly *or indirectly by merger or transfer of stock or otherwise* . . . dispose of all or any substantial part of the assets of the Hospital . . . ." *APA* § 5.2.11(a) (emphasis added).

We find the cases previously cited by the Foundation germane to this issue. For example, in *H-B-S Partnership*, the court ruled that under the terms of the HBS ROFR provision, the right of first refusal was triggered by the stock sale of a great-grandparent to one of the parties of the HBS ROFR provision. *H-B-S Partnership*, 114 P.3d at 315. As we stated above, we do not find the ROFR provision before us to be as broad as that in *H-B-S Partnership* such that we would find the ROFR is triggered by a stock sale involving the actions of any entity other than HCA3 or HCA-NH. Where, however, either HCA3 or HCA-NH is the entity making the transfer (as is the case in the 1999 transaction), we find that *H-B-S Partnership* supports our interpretation of the phrase "indirectly by merger or transfer of stock or otherwise." The *H-B-S Partnership* court held that "[i]n light of the broad language of [the HBS ROFR], expressly restricting both *indirect and direct* transfers of equity interests . . . we conclude that the parties bargained for a broader ROFR than parties to whom the general rule has been applied." *Id.* (emphasis added). We apply the same principle here. The language of the ROFR restricts transfers occurring both "directly or indirectly by merger or transfer of stock or otherwise," thereby demonstrating the parties' intent to reach transactions other than a direct conveyance of the hospital's assets. *See also Asian Yard*, 1995 WL 1781675, at *7; *Continental*, 873 F.2d at 719.

■ We find these cases to be persuasive authority that the phrase "indirectly by merger or transfer of stock or otherwise" in the ROFR provision demonstrates an intent to reach transactions beyond an actual conveyance of the hospital's assets. By including this phrase, HCA3, HCA-NH and the hospital trustees demonstrated their intent that "a [party] could not do indirectly that which it was prohibited from doing directly." *Asian Yard*, 1995 WL 1781675, at *7.

Accordingly, we hold that under the terms of the ROFR provision, so long as either HCA3 or HCA-NH is the entity acting, a transfer of the hospital's assets may occur "indirectly" through a merger, transfer of stock, or other similar transaction sufficient to trigger the ROFR.

The remaining question on appeal, therefore, is to whom this phrase applies. The defendants argue that the parties only intended that a "merger or transfer of stock" of HCA-NH would trigger the ROFR. The Foundation counters that the phrase is not so limited and that such transactions by other members of the HCA corporate family could trigger the ROFR. We

note here that given our above analysis regarding the triggering actors of the ROFR, the Foundation's argument on this point is necessarily limited only to those actions by HCA3 and HCA-NH. Thus, the issue in dispute on appeal is whether a transfer by HCA3 of its interest in HCA-NH's parent company may trigger the ROFR.

■ Both parties argue that we can deem the phrase "indirectly by merger or transfer of stock or otherwise" unambiguous and hold in favor of their respective interpretations. We disagree with both parties. The ROFR provision does not define whose "merger or transfer of stock or otherwise" triggers the ROFR and we find both parties' interpretations to be reasonable. Thus, the language is ambiguous. *See N.A.P.P. Realty Trust v. CC Enterprises*, 147 N.H. 137, 139 (2001) ("The language of a contract is ambiguous if the parties to the contract could reasonably disagree as to the meaning of that language." (quotation omitted)).

■ Where the "agreement's language is ambiguous, it must be deter-mined what the parties, under an objective standard, mutually understood the ambiguous language to mean." *Gen. Linen Servs. v. Franconia Inv. Assocs.*, 150 N.H. 595, 597 (2004). In applying the objective standard, a court should examine the contract as a whole, the circumstances surround-ing execution and the object intended by the agreement, while keeping in mind the goal of giving effect to the intention of the parties. *N.A.P.P. Realty Trust*, 147 N.H. at 141. This "necessarily involves factual findings." *Id.* Given the trial court's grant of the defendants' motion to dismiss on other, mistaken, grounds however, no factual findings were made by the court on this issue. Accordingly, we vacate the order granting the defendants' motion to dismiss and remand to the trial court.

The parties also dispute whether Healthtrust qualifies as a "wholly-owned subsidiary" pursuant to Section 5.2.11(a) of the APA, thereby possibly exempting the 1999 transaction from the ROFR provision. We will address the issue, which deals with contract interpretation, as it is likely to arise on remand.

■ The subsidiary exemption provides, in pertinent part:

> Notwithstanding the foregoing, this Section 5.2.11(a) shall not apply to a Transfer by [HCA3] or HCA-NH to a wholly-owned subsidiary of [HCA3] ("Transferee") if, from and after such Transfer, the Transferee shall perform and assume all obligations of [HCA3] and HCA-NH under this Agreement and prior to such Transfer shall agree to such performance and assumption of obligations in a writing satisfactory to the Seller [Portsmouth Hospital] . . . .

*APA* § 5.2.11(a). Based upon the unambiguous language of this provision, Healthtrust does not qualify as a "wholly-owned subsidiary of [HCA3]." *Id.* At the time of the 1999 transaction, when HCA3 transferred its membership interest in Hospital Corp. to Healthtrust, Healthtrust was the *parent* of HCA3, not a wholly-owned subsidiary. Accordingly, the ROFR exemption for wholly-owned subsidiaries does not apply to the 1999 transaction because it was not "a Transfer by [HCA3] or HCA-NH to a wholly-owned subsidiary of [HCA3]." *Id.*

Therefore, taking as true all the facts well pleaded in the Foundation's amended petition and construing all reasonable inferences in its favor, we find that the Foundation's allegations concerning the 1999 transaction are reasonably susceptible of a construction that would permit recovery. Accordingly, we vacate the trial court's grant of the defendants' motion to dismiss and remand for further proceedings consistent with this opinion.

*Affirmed in part; vacated in part; and remanded.*

DALIANIS and DUGGAN, JJ., concurred.